# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0392V

|  |  |
|---|---|
| KELLY GIBSON,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: April 16, 2025 |

*Rhonda Lorenz-Pignato*, Shannon Law Group, PC, Woodridge, IL, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 8, 2021, Kelly Gibson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on August 20, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent argues that this case is not appropriate for compensation (ECF Nos. 36, 39). The parties have now fully briefed entitlement and damages (ECF Nos. 43, 44, 45). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $47,500.00, plus $326.32 for out-of-pocket medical expenses.

I.   **Factual Evidence**

  A.  **Medical Records**

On August 20, 2020, Petitioner received a flu vaccine in her left deltoid during an appointment with her primary care provider ("PCP"), Dr. Gerard Davidson. Ex. 6 at 189. Dr. Davidson's records list prednisone as a medication that was ordered for Petitioner on September 3, 2020, although there are no further contemporaneous records about why this medication was ordered. Ex. 6 at 251. The following week in September, Petitioner called Dr. Davidson's office stating that she was out of medication, without mentioning anything about her shoulder, and he ordered a different medication. *Id.* at 235. And about a month after vaccination, she saw her neurologist for a routine quarterly treatment. Ex. 2 at 7. She reported that she had been experiencing persistent left shoulder pain and "trouble with deltoid abduction" for the past month following her vaccination. *Id.* at 8. No treatment was provided for her shoulder pain.

Just over a month after vaccination (September 24, 2020), Petitioner returned to Dr. Davidson, now complaining that immediately after her vaccination her arm had become "uncomfortable and painful." Ex. 6 at 248. Over the days and weeks following vaccination, the pain increased with movement. *Id.* The record states that she had previously notified her PCP of her pain, and he had prescribed a low dose of steroids (presumably referring to the September 3rd prednisone order), which helped but did not resolve her pain. *Id.* After she finished the course of steroids, her pain had returned. *Id.* Dr. Davidson prescribed a longer and higher-dose course of steroids, and recommended that she see an orthopedist if her pain persisted. *Id.* at 249.

The following month (October 27, 2020), Petitioner underwent a left shoulder MRI. Ex. 3 at 398. The MRI revealed supraspinatus and infraspinatus tendinosis with a small amount of subacromial subdeltoid bursitis, a delamination type tear of the infraspinatus, glenoid labral fraying, and arthritis. *Id.*

A few weeks later (November 18, 2020), Petitioner saw an orthopedist for her left shoulder pain. Ex. 5 at 4. She related the pain to a flu vaccine she received on August 20th, which she believed was administered too high on her shoulder. *Id.* at 5. The pain did not wake her at night, and she did not have pain reaching overhead or behind her, but reaching out caused "tremendous pain." *Id.* On examination, the Neer's impingement test caused "a substantial amount of pain." *Id.* at 6. The orthopedist reviewed Petitioner's

MRI and diagnosed her with impingement syndrome with subacromial bursitis, as well as probable carpal tunnel syndrome. *Id.* He recommended physical therapy ("PT") three times a week for three weeks. *Id.* If that did not improve her symptoms, he would consider an EMG or cortisone injection. *Id.*

Petitioner underwent a PT evaluation for left shoulder pain the next month, on December 22, 2020. Ex. 4 at 1. She rated her pain as five out of ten. *Id.* Her left shoulder active range of motion was 120 degrees in flexion, 10 degrees in extension, 90 degrees in abduction, 40 degrees in external rotation, and 35 degrees in internal rotation.[3] *Id.* She had mildly reduced strength and positive results on the Neer, apprehension, and supraspinatus tests. *Id.* at 2.

Petitioner attended a second PT appointment on January 8, 2021. Ex. 4 at 5. She complained of left shoulder pain, but did not rate her pain level. *Id.* The therapist noted that she tolerated treatment well, but needed increased time and frequent rest breaks due to pain and weakness in her left shoulder. *Id.* at 6. She felt better and "less stiff" at the end of the session. *Id.*

On May 10, 2021 and September 13, 2021, Petitioner called Dr. Davidson's office complaining of acute pain of her left shoulder. Ex. 6 at 357; Ex. 11 at 28. Prescriptions were ordered after both calls, although it is unclear if they were to treat her shoulder or another condition. *Id.* Petitioner continued to see her neurologist for quarterly treatments of a different chronic condition during 2021, but was not treated by any medical providers for her shoulder after January 8, 2021. Ex. 8 at 12, 22; Ex. 10 at 41.

Petitioner saw Dr. Davidson on October 19, 2021, for leg and back pain, and was given low-dose steroids. Ex. 11 at 42-61. The record does not mention any left shoulder concerns. Six months later, she returned to Dr. Davidson on April 26, 2022, for lower back pain. Ex. 11 at 113-138. The record states that she denied any other extremity problems, and does not mention her left shoulder. *Id.* And on June 30, 2022, she saw Dr. Davidson for an annual physical as well as neck and back pain and other conditions unrelated to her shoulder pain.  Ex. 11 at 201-235. The record does not mention her left shoulder.

On April 13, 2022 - 15 months after her last shoulder treatment - Petitioner messaged her orthopedist through a patient portal stating that she believed she had contacted him during the summer of 2021 about coming in for a cortisone injection, and he agreed she could call his office to schedule it. Ex. 12 at 1. However, she was able to relieve her pain with ice packs and had not scheduled an injection. *Id.* She did not see

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, 70 to 90 degrees in internal rotation, and 50 to 60 degrees in extension. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

3

anything in the patient portal about the summer 2021 communication, and inquired whether a note had been made in her file about that communication. *Id.*

### B. Declarations[4]

Petitioner submitted six declarations in support of her claim. Exs. 1, 13, 14, 15, 16, 17. When she received the flu vaccine on August 20, 2020, it was administered high on her arm, near the top of her shoulder. Ex. 1 at ¶ 7. That evening, she felt muscle soreness in her left arm and was not able to lift that arm without pain. *Id.* at ¶ 9. Over the following days, her pain worsened with any activity including showering, dressing, driving, household chores, laundry, and using her arm to get up from a chair. *Id.* at ¶ 10.

In early September 2020, Petitioner sent a message to her PCP, saying that her arm had been painful since vaccination and was getting worse. Ex. 1 at ¶ 11. Her PCP prescribed prednisone, which helped, but the pain returned when she tapered the dose. *Id.* at ¶¶ 11, 12. The second course of steroids helped, but again the pain returned when she reduced the dose as instructed. *Id.* at ¶ 15.

Petitioner saw an orthopedist in mid-November who referred her for PT. Ex. 1 at ¶ 17. In early December, she was busy trying to help her father after his joint replacement surgery. *Id.* at ¶ 18. She was able to begin PT, but did not seek treatment as aggressively as she otherwise would have for several reasons, including the COVID-19 Pandemic and caring for her elderly parents. *Id* at ¶¶ 18, 19. Her caretaking responsibilities at times took priority over her own needs and led to her being even more cautious about COVID-19 for her parents' protection. *Id* at ¶ 19. As of January 7, 2021, when her first declaration was signed, she stated that she was still under the care of her PCP and orthopedist for this injury. *Id.* at ¶ 20.

Petitioner explains that she did not continue PT after January 8, 2021, due to the prevalence of COVID-19 and because she was caring for her father, who passed away on February 6, 2021. Ex. 13 at ¶¶ 7, 8, 17. In the time leading to his death, her father had frequent medical appointments, which did not leave a lot of time to focus on her own health. *Id.* at ¶ 17. Additionally, in May 2021, Petitioner moved into her father's home, and four months later she helped her mother move into that home with her. *Id.* at ¶ 17. Petitioner then became busy caring for her mother's medical needs, including an upper respiratory infection requiring a hospital admission and two falls resulting in a broken arm and emergency room visits. *Id.*

Petitioner's finances also led her to stop seeking treatment during this time. Ex. 13 at ¶ 18. She is on a fixed income due to other disabilities, and could not afford additional medical bills for a specialist or PT. *Id.* And she was able to do at home much of the same

---

[4] Petitioner acknowledges that the testimonial statements are declarations, although they were labeled affidavits (ECF No. 46 at 2 n.2).

treatment she would have received in PT: she has a personal TENS[5] unit, and was able to do at home the exercises and stretches she learned in PT. *Id.*

Although Petitioner did not return to the orthopedist after her November 2020 appointment, she states that she sent him a message "during the summer of 2021" asking if she could get a cortisone injection because her left shoulder pain had become more severe – although there is no record of this message. Ex. 13 at ¶ 12. Petitioner states that the orthopedist called her back and left a message saying that she could call the office and schedule an appointment for the injection. *Id.* She had a hard time finding the time to go in for an appointment, so instead she used ice packs for a couple of days, which provided some relief, and she did not get an injection. *Id.* She later discovered that the orthopedist did not have any records of her message or his return phone call. *Id.* at ¶ 13.

Petitioner adds that on or about May 10 and September 13, 2021, she called her PCP's office complaining of left shoulder pain, and requested prescription refills during those calls. Ex. 13 at ¶ 14. She saw her PCP on October 19, 2021, for back and leg pain, and also mentioned that she was having shoulder pain from time to time. *Id.* at ¶ 15. He recommended that they focus on her back and leg since her shoulder was not hurting at the time, and prescribed low-dose steroids, which he said would help with all of her aches and pains. *Id.* She saw her PCP again on April 26, 2022 (with her mother present), and told him she was still having left shoulder and back pain; he provided pain medication. *Id.* at ¶ 16.

As of January 2023 (when she signed her second declaration), Petitioner states that she had intermittent left shoulder pain that was usually zero to three out of ten, but ranged to seven to nine at worst. Ex. 13 at ¶ 20. Sleeping on her left side and driving aggravated her pain, while ice, heat, topical medication, using a TENS unit, and gentle stretching and exercises alleviated her pain. *Id.* She had close to full range of motion, with pain at full range. *Id.* She was approximately 85% recovered, but her left shoulder had never returned to its pre-vaccination baseline. *Id.*

Petitioner's mother, Jannit Cantu, filed a declaration on Petitioner's behalf. Ex. 14. Ms. Cantu explains that she saw Petitioner on August 20 or 21, 2020, at which time Petitioner told her the flu vaccine had been given too high on her arm and that her arm hurt badly enough that she could not lift it. *Id.* at ¶ 7. Over the next six months (between August 2020 and February 2021), she saw Petitioner two to three times a month, and spoke with her about 12 times a month. *Id.* at ¶¶ 5, 8, 10. Petitioner frequently mentioned left shoulder pain and difficulties with drying her hair, doing household chores including

---

[5] TENS stands for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that relieves pain by interfering with transmission of pain signals. T*ranscutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Apr. 16, 2025).

laundry, and driving. *Id.* at ¶ 10. Petitioner's left shoulder pain and limitations continued into, and beyond, late February 2021. *Id.* at ¶¶ 10, 11. Ms. Cantu witnessed Petitioner in pain about three to five times a month, when Petitioner would grimace in pain and yell while trying to lift her arm. *Id.* at ¶ 11. Ms. Cantu also observed Petitioner guarding her left arm. *Id.*

After Ms. Cantu moved in with Petitioner in September 2021, Ms. Cantu observed Petitioner icing her left shoulder on several occasions due to severe pain. Ex. 14 at ¶ 12. She observed Petitioner having difficulty using her left arm around the house with activities such as drying her hair, laundry, vacuuming and mopping, sweeping moving objects to dust, putting away dishes, and driving Ms. Cantu to appointments. *Id.*

Carla Gibson, Petitioner's sister, filed a declaration in support of Petitioner's claim. Ex. 15. She sees Petitioner three to five times a month, and they talk three or four times a week. *Id.* at ¶ 5. On or about August 20, 2020 (the date of vaccination), Petitioner told Carla she had received a vaccination too high on her arm and her left shoulder hurt from the injection. *Id.* at ¶ 6. Over the next month, Petitioner complained of left shoulder pain about two to three times a week. *Id.* at ¶ 7. Over the following five months (through late February 2021), Petitioner frequently complained of left shoulder pain, saying that she could not use her left arm to do things like turn the steering wheel, dry her hair, or do laundry or other housework. *Id.* at ¶ 8.

Carla explains that Petitioner's left shoulder pain and limitations continued beyond February 2021. Ex. 14 at ¶ 9. Carla observed Petitioner grimacing and yelling in pain, and Petitioner told Carla that her left shoulder was painful. *Id.* Carla specifically remembers several times during the summer of 2021 when she went with Petitioner to the Walgreens drive-through to pick up prescriptions, and Petitioner said it was painful to reach for her prescription with her left arm, or turn the steering wheel with her left arm. *Id.* at ¶ 10. As of March 2023 (when Carla signed her declaration), Petitioner's shoulder seemed better, although she still complained of occasional left shoulder pain when she used her left arm to turn the steering wheel or reach up or out to get something. *Id.* at ¶ 13.

Petitioner's PCP, Dr. Davidson, signed a declaration on her behalf on May 26, 2023. Ex. 16. He recounts her visit to his office on September 24, 2020 and that he ordered an MRI in October 2020 and referred her to an orthopedist. *Id.* at ¶¶ 6-8. He also saw her for other issues on October 19, 2021, April 26, 2022, and June 30, 2022. *Id.* at ¶ 9. He recalls:

> [D]uring all of these office visits, Ms. Gibson told me she was still having pain and restrictions in her left shoulder since getting the influenza vaccination. I did not record these complaints in my office notes because I had previously referred her to see an orthopedic specialist for that injury and I thought she should follow up with that doctor for any further treatment of her left shoulder injury.

6

> However, I can confirm that Ms. Gibson did have continuing complaints of left shoulder pain for at least 6 months after the vaccination on August 20, 2020.

Ex. 16 at ¶¶ 10, 11.

Petitioner's neurologist, Dr. Danny Bega, also submitted a declaration. Ex. 17. He explains that when he saw Petitioner on September 22, 2020, she complained of shoulder pain from her vaccination a month prior that had not gone away. *Id.* at ¶ 5. He suggested an MRI, and offered to order it if needed. *Id.* Thereafter, he continued to treat her for other chronic concerns on a regular basis, at times every three months. *Id.* at ¶ 6. It was his understanding that she was seeing another provider for her left shoulder injury. *Id.* He recalls her mentioning ongoing left shoulder pain and restrictions at several appointments thereafter, but he did not record those complaints because he was not treating her for that condition. *Id.* at ¶ 7. He adds that her shoulder pain and restrictions following vaccination were in a different location than her pre-vaccination shoulder concerns, and are unrelated to the conditions for which he treats Petitioner. *Id.* at ¶¶ 9-11.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V,

7

1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[6] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a).

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
> 
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> 
> (ii) Pain occurs within the specified time-frame;
> 
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> 
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

Petitioner argues that she has established that she suffered residual effects of her

injury for more than six months. Petitioner's Motion for Ruling on the Record, filed Jan. 9, 2024, at *20-22 (ECF No. 46) ("Mot."). She asserts that medical records support this, focusing on her May 10 and September 13, 2021 calls to Dr. Davidson's office – both after the six-month period – complaining of shoulder pain. Mot. at *20 (citing Ex. 6 at 357, Ex. 11, at 28, and Ex. 13 at ¶ 14). And Drs. Davidson and Bega both submitted declarations confirming that they recall Petitioner continuing to complain of left shoulder symptoms beyond the six-month mark. *Id.* (citing Exs. 16, 17).

Petitioner also notes that at her last PT visit, she was still having pain and had not achieved her PT goals or been discharged. Mot. at *21. She cites *Miller* and *Johnson* in support of her position.[7] *Id.* Petitioner argues that her last PT visit was four months and 19 days after vaccination – 43 days short of the six-month mark. *Id.* at *22. And she has submitted several witness statements, including two from treating physicians. *Id.*

Respondent argues that Petitioner has not established that she suffered residual effects of her injury for more than six months. Respondent's Response, filed Apr. 2, 2024, at *9-10 (ECF No. 53) ("Resp."). Petitioner's last treatment for her shoulder occurred four months and 19 days after vaccination. Resp. at *9. Thereafter, she continued treatment with her neurologist, but the records of those visits do not mention her shoulder. *Id.*

Respondent notes that Petitioner filed her petition less than five months after her vaccination,[8] and in her first declaration stated that her pain was "expected to last longer than six months." Resp. at *9 (citing Ex. 1 at ¶ 24). Although she later filed a second declaration stating that her symptoms continued beyond six months, Respondent urges that I give this less weight because it is a post-litigation statement. *Id.*

Petitioner replies that the declarations of Drs. Davidson and Bega provide convincing evidence that Petitioner's SIRVA continued for over six months. Petitioner's Reply Brief, filed Apr. 8, 2024, at *2 (ECF No. 54) ("Reply"). And the remaining declarations provide additional support. *Id.* at *2-3.

Although the record of the January 8, 2021 PT visit (just over four and a half months after the onset of Petitioner's injury) stated that Petitioner was feeling better, the remainder of the record indicated that she continued to report pain, and needed increased time and frequent rest breaks during the session due to her shoulder pain and weakness.

---

[7] *Miller v. Sec'y of Health & Human Servs.*, No. 20-1900V, 2023 WL 1468491 (Fed. Cl. Spec. Mstr. Sept. 29, 2022) (finding severity requirement met where Petitioner was discharged from PT 42 days short of six months and was pain-free with full range of motion, but still had minor scapular winging and weakness), and *Johnson v. Sec'y of Health & Hunan Servs.*, No. 19-1807V, 2022 WL17968787 (Fed. Cl. Spec. Mstr. Oct. 27, 2022) (finding Petitioner had preponderantly established residual effects lasting at least six months although he stopped PT after just over four months but remained symptomatic).

[8] Petitioner explains that the petition was filed early "at a time when it was thought SIRVA might be eliminated" from the Vaccine Injury Table. Mot. at *1 n. 1.

Reply at *3. Thus, the statement in the record about feeling better was about a *temporary* feeling Petitioner had at the end of the session – not an indication that her condition had resolved. *Id.*

### C. Factual Findings on Severity

After careful review of the entire record, I determine that Petitioner has preponderantly established that her shoulder pain continued for more than six months. Although she stopped formal treatment after just over four and a half months (in January 2021), the record does not suggest that she did so because her symptoms were gone. To the contrary, at her last treatment visit she continued to report pain, and needed extra time and frequent breaks *because of* that pain.

In addition, the record establishes that by December 2020, Petitioner's pain level was five out of ten. She did not rate her pain level at the final January 2021 PT session, but still needed accommodations for her pain. Thus, although Petitioner did not continue formal treatment for a full six months, the record establishes that she remained symptomatic and had not met treatment goals even after she ceased treatment. In this context, it is a reasonable inference that she continued to experience residual effects beyond the date of her treatment cessation. *Johnson*, 2022 WL 17968787, at *4.

Furthermore, two of Petitioner's treating physicians have testified that she continued to report shoulder pain well after the six-month period, although they did not record this in her medical records. And there are records showing that she called her PCP in May and September 2021 complaining of shoulder pain. Petitioner has also provided copious testimonial evidence that corroborates the medical records on this issue.

### D. Factual Findings on SIRVA QAI Criteria and Remaining Statutory Requirements

The QAI and remaining statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms.[9] Exs. 2, 3, 6. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 4 at 1. She received a covered

---

[9] Respondent noted that Petitioner had a pre-vaccination history of pain in her neck and shoulders, but did not argue that this pre-vaccination history would explain Petitioner's post-vaccination symptoms. Petitioner and her treating neurologist explained that her pre-existing cervical issue caused pain that was located in a different area and was otherwise different from her post-vaccination symptoms. *See* Ex. 17 at ¶ 11 (Petitioner's neurologist stated that Petitioner's pre-vaccination pain "was located in a completely different area, and was a different type of pain, than the pain she experienced after her vaccination"); Ex. 1 at ¶ 5 (Petitioner noted that the location of her pre-vaccination pain was "different from the area where [she] felt pain from the vaccination injury"). In light of the parties' position and record evidence, the evidence preponderantly supports a finding that Petitioner's pre-vaccination condition would not explain her post-vaccination symptoms.

vaccine in the United States. Ex. 6 at 189. And she states that she not previously collected an award or settlement, nor are there any civil actions pending, for her vaccine-related injury. Ex. 1 at ¶ ¶ 25, 26.

I find that Petitioner has established by a preponderance of the evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[10]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $77,000.00, citing awards in *Balch* and *Bordelon*.[11] Mot. at *34-36. She asserts that her injury was initially severe, then became milder "over the course of several years." Mot. at *28. She characterizes her injury as continuing for at least 22 months up to 31 months, citing testimonial evidence. *Id.* at *33.

---

[10] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[11] *Balch v. Sec'y of Health & Human Servs.*, No. 20-0872V, 2023 WL 150783 (Fed. Cl. Spec. Mstr. Dec. 9, 2022) (awarding $77,000.00 in pain and suffering); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. April 24, 2019) (awarding $75,000.00 in pain and suffering).

Respondent argues that Petitioner's injury was very mild, and proposes "an award consistent with awards in other cases of that nature," without proposing a specific award. Resp. at *13. Respondent asserts that the Government routinely proffers less than $37,500.00 "when it is clear that damages are worth less than the lowest reasoned" damages decisions, citing *McKenna*, *Valdez*, *McGraw*, and *Ramos*.[12] *Id*. at *16.

Respondent asserts that Petitioner experienced only mild to moderate pain levels for the entirety of her brief treatment period. Resp. at *16. She suffered from a pre-existing cervical condition, which caused neck and shoulder pain. *Id*. And her treatment was limited to two PT sessions and oral steroids (in addition to orthopedic consultation and an MRI). *Id*. Respondent views these factors as "consistent with some of the mildest SIRVA injuries in the Vaccine Program, and the amount of damages awarded should be commensurate with that." *Id*. Respondent argues that the cases Petitioner relies on involve higher documented pain levels and pain for a longer period of time than Petitioner, and thus are not good comparables. *Id*. at *17. As such, Respondent proposes an award of an unspecified amount, but less than the $75,000.00 awarded in *Bordelon*. *Id*. at *17-18.

Petitioner states that she contacted her PCP 14 days after vaccination reporting shoulder pain, and he thought it severe enough to prescribe an oral steroid. Reply at *5. She then saw her PCP about a month after vaccination, and he prescribed a stronger dosage of steroids. *Id*. When her symptoms persisted, he ordered an MRI. *Id*. Based on the MRI results, he referred her to an orthopedist. *Id*. She reported "very high" pain to her orthopedist, and at her PT evaluation her pain was five out of ten. *Id*.

Petitioner stopped formal treatment of her injury for several reasons, including the dangers associated with the COVID-19 Pandemic. Reply at *6. One factor was that a therapist at her PT facility tested positive for COVID. *Id*.

### C. Appropriate Compensation for Pain and Suffering

Overall, Petitioner's injury was evidently mild and of a limited duration. Although Petitioner suggests based on declarations that her injury persisted for two or three years, the evidence to that effect is quite limited and ultimately not persuasive. Petitioner sought care until just over four and a half months, at which point her shoulder condition had improved but remained symptomatic.

---

[12] *McKenna v. Sec'y of Health & Human Servs*., No. 21-0030V, 2023 WL 5045121, at *3 (Fed. Cl. Spec. Mstr. July 7, 2023) (identifying proffers lower than $37,500.00); *Valdez v. Sec'y of Health & Human Servs*., No. 21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb, 28, 2024) (awarding $35,000.00 in pain and suffering): *McGraw v. Sec'y of Health & Human Servs*., No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024) (awarding $37,500.00 in case involving mild SIRVA treated for six months with very conservative treatment); *Ramos v. Sec'y of Health & Human Servs*., No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 in pain and suffering for a mild SIRVA that did not necessitate immediate care, surgery, or lengthy treatment).

The record supports the conclusion that Petitioner's shoulder condition did not *fully* resolve by the six month mark (i.e., mid to late February 2021). This is supported by her continuing symptoms at her January 2021 PT session, her messages to her PCP in May and September 2021 continuing to complain of shoulder pain, and her testimonial evidence, including that of her treating physicians. But her condition did not likely persist much beyond. Although she may have had occasional symptoms after that time, they were not serious enough to warrant treatment or, at times, even mention in her medical records. Dr. Davidson testified that Petitioner did in fact continue to complain of shoulder pain during her visits in October 2021, April 2022, and June 2022, but he does not explain how he is able to recall this a year or more later. It is particularly difficult to understand why he would document that Petitioner *denied* extremity problems at her April 2022 appointment if she in fact *complained* about arm pain.

Petitioner was first seen for her shoulder injury 35 days after vaccination, although she called her PCP and received a prescription three weeks before that, apparently for her shoulder injury. That she sought care twice within just over a month bolsters her claim. She had an MRI and consulted with an orthopedist once, and treated conservatively with two PT sessions and prescription medication. That her condition resolved with minimal treatment and just *barely* persisted past the six month mark favors a smaller pain and suffering award.

Petitioner's cases, *Balch* and *Bordelon*, involve much more serious injuries. Both Ms. Gibson and the *Balch* petitioner were first seen for their injuries just over a month after vaccination (though Ms. Gibson received prescription medication sooner) and treated conservatively, with neither undergoing surgery or steroid injections. Both petitioners treated with minimal PT and had relatively mild pain overall, although the *Balch* petitioner initially reported relatively significant and sharp pain. However, the *Balch* petitioner treated for much longer than Ms. Gibson – a year and a half – and demonstrated meaningful impacts on his personal activities and well-being. And the *Bordelon* petitioner had much more severe pain, sought care sooner, received a steroid injection, and underwent much more PT.

Of Respondent's cases, *McGraw* comes the closest factually to the present matter, involving a similar duration, pain ratings, and conservative treatment not including surgery or steroid injections. However, the petitioner in that case delayed seeking care for longer (almost two months), and did not treat with any PT.

Having reviewed the record and briefing, I find that Petitioner's injury falls somewhere between the cases cited by the parties. As such, I find that an award of **$47,500.00** for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $47,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[13] Additionally, I find that Petitioner is entitled to **$326.32 in out of pocket expenses.**[14]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $47,826.32, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] The parties agree that this amount is reimbursable. Petitioner's Supplement, filed Jan. 19, 2024, at *2 (ECF No. 50); Resp. at *11 n.9.

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

15